# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

United States of America,

      Plaintiff,

                                      Case No. 20-cr-20452

v.                                  Hon. Denise Page Hood

Sophie Toya, M.D.,

      Defendant.

---

## SUPPLEMENTAL SENTENCING MEMORANDUM

Defendant Sophie Toya, M.D. ("Dr. Toya"), respectfully submits this Supplemental Sentencing Memorandum to provide additional information and context in support of a sentence that is "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a), supplementing the Sentencing Memorandum previously filed on January 2, 2025. See ECF No. 81. At the outset, Dr. Toya incorporates by express reference all arguments made therein.

### I.    Cultural Mitigation Under § 3553(a)-(b) Supports a Downward Variance

The Court must impose a sentence that is "sufficient, *but not greater than necessary*" to achieve the statutory objectives of sentencing: reflecting the seriousness of the offense, promoting respect for the law, providing just punishment,

affording adequate deterrence, protecting the public, and delivering necessary treatment or training. 18 U.S.C. § 3553(a)(2).

As a threshold matter, however, the Court is required to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Additionally, under § 3553(b)(1), the Court may depart downward based on the presence of a mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." When evaluating such circumstances, the Court may consider any relevant information with "sufficient indicia of reliability," regardless of formal admissibility. U.S.S.G. § 6A1.3(a).

Courts have acknowledged that a defendant's cultural background may justify a variance or departure in appropriate cases. *See United States v. Yu*, 954 F.2d 951, 953 (3d Cir. 1992) ("[W]e will simply assume without deciding that in some cases the cultural differences between the United States and another country may justify downward departure.").

In *Yu*, the defendant was born in Korea, attended law school there, and immigrated to the United States at the age of 46 with his wife and four children. *Id*. at 952-53. Prior to immigrating, he had worked for what his attorney described as the Korean equivalent of the Internal Revenue Service. *Id*. After arriving in the United States, he became a naturalized citizen, took courses at Temple University,

obtained a doctoral degree, and established a successful accounting business. *Id.* at 953. Following an investigation and subsequent plea agreement, the defendant was convicted of bribery under 18 U.S.C. § 201(b)(1)(A) after making payments to an IRS examiner. *Id.* At sentencing, he argued that, based on his Korean background, the bribe was culturally understood as an "honorarium," and that it would have been offensive not to offer such a payment. *Id.*

The Third Circuit acknowledged that a cultural misunderstanding could, in principle, warrant a departure if it bore upon the defendant's culpability. *Id.* at 954. ("Thus, it is conceivable that [a defendant] might reasonably point to practices in his country of origin that would justify downward departure on the grounds that while he intended to do the acts for which he was convicted and was thus criminally liable, he did not recognize the extent of his culpability in this country."). However, the court ultimately declined to apply the departure in *Yu* because the defendant did not assert that he was unaware his actions violated U.S. law and the record suggested his motive was personal gain. *Id.* at 954-55.

Here, by contrast, Dr. Toya's case presents the precise cultural mitigation the Third Circuit contemplated in *Yu*. Dr. Toya did not act out of greed, nor did she intend to violate the law. Her convictions under 18 U.S.C. §§ 1347, 1035(a)(2), and 2 arose from her culturally-ingrained deference to apparent organization authority, good-

faith reliance on administrative systems, and her unfamiliarity with the American regulatory landscape.

As reflected in her Presentence Investigation Report and original Sentencing Memorandum, Dr. Toya was born in Athens, Greece, on April 15, 1969, raised in Chalcis, and earned her medical degree from the University of Ioannina. She dedicated the early years of her career to underserved communities in Greece before immigrating to the United States in 1998 to expand her clinical training. She became a naturalized citizen in 2015. Like the defendant in *Yu*, she arrived as a well-educated professional. But like many immigrants, Dr. Toya did not—and could not—shed her cultural worldview upon entry. Notably, the Third Circuit in *Yu* did not suggest that educational attainment negates cultural influence.

Unlike the defendant in *Yu*, Dr. Toya did not understand the extent of her legal culpability. Her participation in the conduct underlying her conviction was shaped by a sincere and culturally influenced misapprehension of how U.S. medical business operations functioned. She accepted telemedicine work from companies that appeared legitimate and professionally structured; entities she located through reputable placement services such as Indeed and MDstaffers. The companies, Procall and ISP, presented her with patient charts that appeared complete, utilized structured patient intake systems, and provided diagnostic summaries that reflected what she understood to be standard clinical documentation. Notably, the two

4

companies even differed in how they instructed Dr. Toya to interact with patients. One company required patient interaction, the other did not, further compounding her confusion and highlighting the absence of clarity surrounding her clinical obligations.

At trial, Willie McNeal, the owner of ISP and the *only* actual architect of the international fraud scheme to testify, confirmed that he worked directly with MDstaffers and "was never in a position to speak to her (i.e., Dr. Toya)." ECF No. 62 at 31. He further admitted that he never informed Dr. Toya that the software used in ISP's "auto-scribe" platform was "designed to fool Medicare." *Id*. On the contrary, he testified that he intentionally portrayed ISP as a legitimate telemedicine company to staffing agencies. *Id*. at 33-34. He even retained a law firm under false pretenses to draft letters intended to convince medical staffing companies and their contractors that ISP was compliant with federal law. *Id*. at 35. See also ECF No. 81 at 12 (citing ECF No. 62 at 119) ("Special Agent Mark Vanzetta agreed at trial that the schemers 'all did their level best' to make it appear above board to outsiders."); ECF No. 59 at 138 (Dr. Randy Swackhammer testified that Procall "sounded like a legitimate operation.").

Dr. Toya, then a newly single mother of two following the end of her marriage in 2018, viewed these roles as an opportunity to continue helping others while rebuilding her life. She felt a deep personal connection to patients in need of

prosthetics and orthopedic devices, having grown up watching her father live with a disability. The chance to care for patients facing similar challenges felt like a meaningful way to honor his memory.

Her sole role was prescribing medical devices based on pre-filled patient charts that appeared to reflect valid diagnoses and prior treatment. She did not design the scheme, conceal its mechanics, or substantially profit from its operation. See ECF No. 81 at 18 ("For each patient consultation, she was paid $25 or $30 whether she prescribed one brace, more than one brace, or no braces. Over the course of roughly six months, she earned a total of $120,475."). She had no involvement in billing, administrative oversight, or claims processing, and was entirely removed from the financial exploitation that lay at the heart of the offense. That the enterprise turned out to be fraudulent was, for her, a tragic revelation, not a calculated risk.

Dr. Toya's failure to ask harder questions or probe more deeply was not the product of recklessness or malice, but of cultural deference to institutional legitimacy. In Greece, physicians operate within state-run systems and rely on established administrative frameworks to safeguard compliance. The notion that a sophisticated fraud could be architected through polished telemedicine companies and marketed through mainstream platforms like Indeed or MDstaffers was simply outside her frame of reference.

Throughout her career, Dr. Toya has remained steadfastly focused on the ethical *practice* of medicine. She has never handled billing responsibilities, nor was she ever involved in the financial or operational structure of the companies that employed her. Her professional focus has always been on patient care, not on navigating the complexities of Medicare billing or federal regulatory compliance. She operated in good faith, assuming that others, particularly those who appeared to be handling administrative matters lawfully, were doing so within the bounds of legality.

Her case highlights the precise gap § 3553(a)(1) is intended to illuminate: the difference between core statutory violations and inadvertent entanglement in complex regulatory frameworks. Dr. Toya did not steal, fabricate documents, or conceal information. She entered what she reasonably believed to be an arms-length contractual relationship with seemingly legitimate telemedicine companies— entities that, unbeknownst to her, were exploiting her good faith and clinical judgment to facilitate fraud.

These companies ultimately drew her into a scheme she neither designed nor understood. Yet, ironically, the government has characterized the matter "as one scheme…and the scheme is a scheme of her actions." ECF No. 59 at 8; see also ECF No. 1 at 6-11 (describing an international fraud network), ECF No. 59 at 8 (asserting that Dr. Toya knowingly participated alongside "dozens and dozens" of accomplices

and co-conspirators). That characterization collapses the critical distinction between intentional fraud and unwitting involvement, and disregards both the factual record and the individualized culpability analysis that § 3553(a) demands.

## II.   The Sophisticated Means Enhancement is Factually and Legally Inapplicable

For these same reasons, and additional ones detailed here, the two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) is improper. The PSR justifies the enhancement by asserting: "The defendant's false medical records and false diagnoses were integral to the healthcare fraud scheme; therefore, as the offense involved sophisticated means, two levels are added." See ECF No. 77 at 16.

However, as the Sixth Circuit has made clear, this enhancement must be based on "actions taken by the individual." *United States v. Butler*, 297 F.3d 505, 516 (6th Cir. 2002). It is not enough that the scheme as a whole involved sophistication; the enhancement applies only where the defendant's own conduct was "especially complex or especially intricate." U.S.S.G. § § 2B1.1 cmt. n.9(B); *see also United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996) ("A defendant involved in a complex or repetitive…conspiracy is not automatically given a sophisticated means enhancement if his or her own personal involvement did not constitute sophisticated means.").

The government argues that, "[t]aken together, Defendant's false patient files, false diagnoses, and false medical necessity certifications, all of which were designed to deceive Medicare into paying for braces it would not have otherwise paid for, warrant applying the sophisticated means enhancement." See ECF No. 82 at 18. The record is devoid of any evidence that Dr. Toya personally created any false patient file, authored any false diagnosis, or knowingly certified medical necessity for equipment that was not justified. Rather, the records and diagnoses at issue were created and presented to her by the telemedicine companies that took deliberate steps to appear lawful, organized, and compliant. Dr. Toya reviewed these files in her capacity as a contracted physician and relied, in good faith, on the apparent legitimacy of the materials provided. Her actions were clinical, not deceptive; passive, not strategic. To the extent those files were falsified, the deception occurred upstream, beyond her control and outside her awareness.

More tangentially, the government's reliance on so-called "false" medical necessity certifications overlooks a fundamental distinction that matters immensely to physicians like Dr. Toya. Under § 13.5.4 of the Medicare Program Integrity Manual (MPIP), "medical necessity" is defined in clinical terms: a service must be safe, effective, non-experimental, and furnished in accordance with accepted standards of medical practice, appropriate to the patient's condition, ordered by qualified personnel, and no more than what the patient medically needs.

This is how Dr. Toya—like the vast majority of physicians unfamiliar with the finer administrative machinery of Medicare billing—understood the concept. But reimbursement under Medicare often depends on far narrower, technical prerequisites set forth in National Coverage Determinations (NCDs) and, even more restrictively, Local Coverage Determinations (LCDs). These requirements are typically buried in dense administrative guidance, vary by contractor jurisdiction, and are viewed by many clinicians as billing-layer afterthoughts managed by others, not as integral to their clinical judgment.

This is not a case of a physician jeopardizing patient health for personal gain. Dr. Toya did not traffic in highly addictive controlled substances, nor did she exploit vulnerable populations for profit. To the contrary, if prescribing opioids without legitimate need (i.e., a practice often tied to greed and lasting patient harm) sits at one end of the severity spectrum, prescribing orthopedic braces that can be purchased at a retail pharmacy or convenience store sits firmly at the other. These were not dangerous interventions, nor was there any allegation that Dr. Toya's involvement caused physical harm. Her offense, viewed in proper context, was a regulatory misstep, not a betrayal of medical ethics.

For a foreign-trained physician unfamiliar with the nuances of Medicare's regulatory infrastructure, the notion that her signature on a prescription, based on what she believed to be a clinically appropriate chart, could render her criminally

10

liable for false certification is both unforeseeable and inconsistent with the principles of fair notice and proportionality. See, e.g., *Cheek v. United States*, 498 U.S. 192, 199-200 (1991) ("The proliferation…regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed.").

Additionally, the government's assertion that Dr. Toya's conduct was "designed to deceive Medicare into paying for braces" collapses the difference between the means of the scheme and Dr. Toya's personal conduct. In other words, the government's assertion improperly attributes the complexity of the overall scheme to Dr. Toya personally, without regard to the limited, peripheral nature of her own conduct.

Sixth Circuit precedent makes clear that the sophisticated means enhancement is intended for defendants who personally engage in especially intricate or deliberately concealed conduct, not those whose limited roles merely intersect with a broader, more complex scheme. In *United States v. Kraig*, the Sixth Circuit upheld the enhancement but expressly noted that it "might have reached a different conclusion than the District Court," because the defendant—convicted by a jury of a single count of conspiracy to assist in concealing a third party's assets from the IRS—"did not personally open the Swiss bank accounts or set up the shell

11

corporations—this was the work of the Panamanian law firm." 99 F.3d at 1363, 1371.

Although the court affirmed the enhancement under the deferential standard of review, it acknowledged that Kraig's "personal involvement with them was minimal," signaling that a closer causal nexus between the defendant's conduct and the scheme's sophistication is essential for the enhancement to apply properly. *Id*. at 1371. Notably, even Kraig was charged and convicted of conspiracy, whereas Dr. Toya was not. The government brought no conspiracy charge in this case, which further illustrates the individualized and limited nature of her conduct in contrast to those for whom the sophisticated means enhancement is typically applied.

Similarly, in *United States v. Rupp*, the Sixth Circuit reiterated that the enhancement applies only where the defendant's conduct involves "highly complex, refined, or developed" fraud tactics, such as the use of "fictitious entities" or "corporate shells" to obscure transactions. *United States v. Rupp*, No. 22-1240, 2023 U.S. App. LEXIS 2052, at *14-15 (6th Cir. Jan. 24, 2023). Dr. Toya did not of these things. She did not create false identities, manipulate corporate structures, conceal assets, or obscure transactions. She reviewed patient files presented to her by third parties and signed prescriptions in her clinical capacity based on charts that, although now known to be part of a fraudulent scheme, appeared routine and legitimate at the time.

12

Ultimately, the government's argument misattributes the sophistication of the scheme to Dr. Toya individually, without factual or legal support. Her conduct simply does not rise to the level of intricacy or deception that justifies this enhancement under either the Guidelines or the Sixth Circuit's controlling interpretation.

Finally, it is telling that, in support of its argument for applying the sophisticated means enhancement, the government relies on *United States v. Griffith*, 663 F. App'x 446 (6th Cir. 2016), and *United States v. Mahmud*, 541 F. App'x 630 (6th Cir. 2013). Both of these cases involve multiple co-conspirators, coordinated bribery, and elaborate concealment mechanisms. See ECF No. 82 at 17. In *Griffith*, defendants bribed Medicare beneficiaries and billed for fictitious home health services, 663 F. App'x at 447; in *Mahmud*, co-conspirators manipulated documentation and recruited patients to mask ongoing fraud, 541 F. App'x at 636.

By contrast, Dr. Toya "acted" alone, at a distance, with her conduct lacking any of the hallmarks of planning, concealment, or intentional manipulation that typically justify application of the sophisticated means enhancement. To apply that enhancement in this context would be to stretch it well beyond its intended scope and conflate unwitting participation with deliberate complexity.

In fact, far from warranting an enhancement for the use of sophisticated means, Dr. Toya's role in the broader scheme described in the Indictment was so

limited that she qualifies for a downward adjustment under U.S.S.G. § 3B1.2(a) as a minimal participant. As her original Sentencing Memorandum noted, the Sixth Circuit has held that "[t]he guidelines contemplate a minimal participant as one who plays a single, limited role in the conspiracy." *United States v. Brabson*, 93 F. App'x 736, 738 (6th Cir. 2004). See ECF No. 81 at 20. Yet even that standard involved a charged conspiracy, something that the government chose not to allege here. Dr. Toya was not part of any charged agreement, had no role in structuring the fraud, and exercised no discretion over how claims were submitted or reviewed. Her participation was limited and anything but "sophisticated"—she acted at arm's length, had no involvement in planning, concealment, or billing, and relied entirely on others for information and infrastructure. She was medically motivated, informationally constrained, and functionally isolated.

## III.   The § 3B1.3 Enhancement for Abuse of Trust or Use of Special Skill Does Not Apply

The two-level enhancement under U.S.S.G. § 3B1.3 is unwarranted. While Dr. Toya was a licensed physician and enrolled Medicare provider, there is no evidence that she *abused* that status or *used* her professional qualifications in a way that "significantly facilitated the commission or concealment of the offense." Her role was limited to reviewing and singing charts prepared by others, in reliance on

14

materials that appeared legitimate. She neither orchestrated the fraud nor attempted to conceal it.

"For the enhancement to apply, [the] defendant must have been in a position of trust with respect to the victim of the crime." *United States v. Ragland*, 72 F.3d 500, 502 (6th Cir.1996) (emphasis added). Moreover, "the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense." U.S.S.G. § 3B1.3, comment. n.1. This determination turns not on formal titles or professions, but on the "*actual* nature of the relationship" and the discretion involved. *See United States v. Boyle*, 10 F.3d 485, 489 (7th Cir.1993) ("[T]he sentencing court must look beyond descriptive labels to the actual nature of the relationship and the responsibility the defendant is given.").

Here, Dr. Toya's relationship to Medicare was remote and regulated. She did not bill Medicare directly, did not participate in any administrative submissions, and had no discretion over whether claims were ultimately submitted or approved. Courts have rejected § 3B1.3 enhancements under similar circumstances where a physician or healthcare professional lacked control over the fraud's execution. *See, e.g., United States v. Custodio*, 39 F.3d 1121, 1126 (10th Cir. 1994) (enhancement inapplicable where the defendant's position "did not allow him to make his wrongs more difficult to detect, although it did allow him to abuse the system.").

15

Nor did Dr. Toya exercise the kind of discretionary authority that § 3B1.3 was designed to penalize. As the Eleventh Circuit explained in *United States v. Garrison*, 133 F.3d 831, 839-41 (11th Cir. 1998), the enhancement applies only where the defendant holds a "sufficiently proximate position of trust relative to Medicare," and not where the relationship is filtered through fiscal intermediaries, like Aetna in that case—or in Dr. Toya's case, through the administrative machinery of telemedicine platforms. Moreover, Garrison's lack of discretion over cost reports, and her reliance on others to complete and submit them, rendered the enhancement improper. The same holds true here: Dr. Toya was not involved in claim generation of submission, let alone any concealment.

Finally, as the Second Circuit held in *United States v. Echevarria*, 33 F.3d 175, 181 (2d Cir. 1994), § 3B1.3 should not be applied where the underlying offense already penalizes the role or status of the defendant. As the court noted: "We deem it anomalous to enhance that punishment pursuant to § 3B1.3, which is directed at the special opportunities for criminal conduct that are available to those who *legitimately* occupy positions of public or private trust." *Id*. Although Dr. Toya did not falsely claim to be a physician or misrepresent her qualifications, like the defendant in *Echevarria* did, what is critical here is that Dr. Toya did not *legitimately* occupy a position of public trust in the most functional sense. That is, while she believed she was acting as a lawful Medicare provider, she was in fact deceived by

companies that deliberately structured themselves to appear compliant and legitimate. Her trust in those structures means she was not exercising discretionary authority that she *knew* had been entrusted to her by the program or its beneficiaries. She believed she was merely performing a narrow, clinical task in accordance with applicable standards.

Even assuming her professional status played a functional role in enabling the fraud, that fact is already accounted for by her conviction itself. To apply an additional enhancement based solely on her medical license, without any evidence that she knowingly abused it to commit or conceal the offense, would be both duplicative and inconsistent with the limited scope of § 3B1.3.

## IV. The 18-Level Enhancement for Intended Loss Overstates Dr. Toya's Role, Intent, and Foreseeability

The PSR recommends an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J), based on an intended loss amount of $6,372,066.00—the value of claims submitted to Medicare during the period Dr. Toya was contracted to prescribe orthopedic braces. While it is true that Dr. Toya's prescriptions were linked to the submission of these claims, the enhancement nonetheless overstates her personal culpability, categorically assumes that all of the claims were not medically necessary from a clinical perspective, and fails to properly account for the foreseeability of the loss amount under the Sentencing Guidelines.

Loss enhancements are not automatic. A defendant is only accountable for loss amounts that were intended or reasonably foreseeable to her at the time of the offense. *See United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002); *United States v. Catchings*, 708 F.3d 710, 719 (6th Cir. 2013). Critically, this Court is required to "make **particularized** findings with respect to both the scope of the defendant's agreement **and** the foreseeability of [her] co-conspirators' conduct before holding the defendant accountable for the scope of the entire conspiracy." *Campbell*, 279 F.3d at 400 (emphasis added). Without these findings, a defendant risks being sentenced based on the conduct of others in a scheme she neither agreed to join nor reasonably foresaw. *Id.*

Here, in its Indictment, the government alleged that Dr. Toya and her "accomplices" were responsible for billing Medicare approximately $6.3 million, and receiving approximately $3.6 million, in connection with fraudulent brace prescriptions. ECF No. 1 at 11; see also ECF No. 51 at 545. While Dr. Toya's prescriptions were a necessary condition for those claims to be submitted, she did not personally submit the claims, determine the billing codes, or engage with the administrative side of the reimbursement process. She had no access to Medicare billing systems and no visibility into the financial structure or magnitude of the scheme. Her clinical review was limited to individualized patient charts prepared by third parties; again, charts that appeared complete, compliant, and medically

appropriate. There is no evidence that she was aware of, let alone intended, the volume or dollar value of the claims ultimately tied to her signature, or even that she did, in fact, sign each and every claim comprising the $6.3 million in submissions in the first place.

Moreover, the Sentencing Guidelines define "intended loss" as the loss the defendant "purposely sought to inflict," not the loss that others derived or could have derived through unrelated conduct or mere "speculat[ion] concerning the existence of a fact which would permit a more severe sentence under the guidelines" (i.e., loss amount). *See* U.S.S.G. § 2B1.1(b)(1), n.3(C); *United States v. Willis*, 560 F.3d 1246, 1251 (11th Cir. 2009) (quoting *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997)). There is simply no evidence, direct or circumstantial, that Dr. Toya purposefully sought to inflict a $6.3 million loss on Medicare.

Under the Guidelines' own definition, the intended loss enhancement cannot be divorced from the pecuniary harm that was reasonably foreseeable to the defendant. Application Note 3(a)(i) to U.S.S.G. § 2B1.1 defines "loss" as the "greater of actual or intended loss," and defines "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict" including the "reasonably foreseeable pecuniary harm that resulted from the offense." But the Guidelines also clarify that intended loss must be objectively foreseeable from the standpoint of the defendant. *See, e.g., United States v. Fekrat*, 450 F. App'x  611, 612 (9th Cir. 2011).

19

Here, Dr. Toya was paid a flat rate of $25 or $30 per patient consultation regardless of whether she prescribed on brace, multiple braces, or none. Over the course of roughly six months, she earned $120,475 in total compensation. See ECF No. 81 at 18. She was not paid per claim or per dollar billed and had no knowledge of claim amounts or Medicare's reimbursement metrics.

That compensation figure—$120,475—represents the only pecuniary consequence that was reasonably foreseeable to Dr. Toya. She had no way of knowing that her clinical reviews, based on third-party documentation, would result in millions of dollars in Medicare billing. Fundamentally, then, this amount is a far more accurate proxy for intended loss under the Guidelines, because it reflects the scope of the economic activity she actually agreed to and could have foreseen. To impose an 18-level enhancement based on gross billing figures she never saw, influenced, or understood, rather than the compensation she directly received, would distort the Guidelines' intent and result in a sentence wholly disconnected from Dr. Toya's state of mind and role in the offense.

Additionally, the assumption that **all** of the claims tied to Dr. Toya were medically unnecessary ignores the clinical nuance involved in determining medical necessity. Under § 13.5.4 of MPIM, a service is medically necessary if it is safe, effective, appropriate to the patient's condition, and furnished in accordance with accepted medical practice. As an ethical medical provider, Dr. Toya fundamentally

understood and applied this definition in her clinical role—even if in a practical as opposed a literal sense in having read the definition itself. Put simply, ethical physicians understand "medical necessity," but they may not understand the more granular requirements of NCDs or LCDs, guidelines largely administrative in nature and often interpreted by billing personnel or fiscal intermediaries. This Court should not broadly, retroactively, and speculatively render her clinical judgment fraudulent. To treat all such claims as presumptively false exaggerates her culpability and stretches the concept of "intended loss" beyond what § 2B1.1 permits.

Finally, applying the full 18-level enhancement effectively treats Dr. Toya as though she orchestrated the fraud, when in fact she was a remote, contract-based physician with no authority, control, or stake in the billing process. Even if this enhancement is technically applicable, this Court should consider a substantial downward variance to reflect Dr. Toya's peripheral role, absence of intent, and lack of financial motive, especially given the extraordinary circumstances of this case, which "walks and talks" like a conspiracy prosecution but, notably, is not one. The government chose not to charge Dr. Toya with conspiracy, and for good reason: there is no evidence of a jointly undertaken criminal agreement, shared intent, or mutual understanding with co-schemers. That absence is telling. To now sentence her as though she had embraced the full scope of the fraud, despite no charge, finding, or

agreement, would result in a disparity untethered from the individualized culpability sentencing demands.

## V.  Extraordinary Family Circumstances Warrant a Downward Departure Under § 5H1.6

Lastly—and certainly not least—Dr. Toya respectfully implores this Court to depart from the applicable guideline range in light of her exceptional family responsibilities.

"There is no <u>per se</u> rule precluding the consideration of family circumstances or parental responsibilities in deciding whether a downward departure is warranted." *United States v. Morales-Berrones*, Nos. 95-3402/95-3404, 1996 U.S. App. LEXIS 25019, at *5-6 (6th Cir. Sep. 5, 1996) (citing U.S.S.G. § 5H1.6)). While "family ties and responsibilities are not ordinarily relevant," "[e]very circuit court of appeals that has considered this policy statement has concluded that family considerations are an appropriate basis for departing downward if the circumstances are extraordinary." *Id*. The district court must evaluate "whether those circumstances and responsibilities, either individually or in combination with other permissible circumstances, convert this case from an ordinary one into an extraordinary one." *Id*. at *7.

Here, that threshold is clearly met. Dr. Toya is the sole caregiver to her two children: an 18-year-old college student and a 14-year-old high school freshman. See

ECF No. 77 at 35. Her ex-husband, Antonis Skordilis, is a part-time Uber driver who provides no financial support, has no active parental involvement, and lives rent-free in a home that Dr. Toya owns and continues to financially maintain. *Id*.; see also ECF No. 81 at 10-11. When interviewed by the probation department, Mr. Skordilis corroborated this arrangement and confirmed that Dr. Toya pays all of his monthly bills except his phone bill. *Id*. at 35. He conceded that Dr. Toya's incarceration would "have a major impact" on the family and that neither of the proposed alternatives— him relocating to Michigan or the children relocating to Indiana—were viable. *Id*.

The emotional consequences are just as severe. Dr. Toya's 14-year-old daughter has stated that she "would have nowhere to go and nobody to turn to," and her 18-year-old son has expressed that his life "will be destroyed" without his mother's continued presence and support. See ECF No. 81 at 10 (citing Exh. H, at 2; Exh. C, at 1). In addition to her children, Dr. Toya also provides ongoing support to her sister in Greece, who suffers from severe manic depression and social anxiety disorder and has never been able to work or care for herself. *Id*. at 11.

Courts have granted departures in similar or even less compelling situations. In *United States v. Alba*, the Second Circuit affirmed a downward departure where the defendant's continued employment was critical to his family's economic stability, and incarceration "might well result in the destruction of an otherwise strong family unit." 933 F.2d 1117, 1122 (2d Cir. 1991). Likewise, in *United States*

23

*v. Owens*, the Seventh Circuit upheld a departure based on the defendant's care for his children and adult brother with Down syndrome, even while recognizing the case did "not present the most compelling set of facts." 145 F.3d 923, 926-29 (7th Cir. 1998). In *United States v. Pearson*, the district court emphasized that sentencing courts "possesses the discretion to avoid wreaking destruction on dependents who rely on the defendant for their care." 282 F. Supp. 2d 941, 946 (E.D. Wis. 2003).

Dr. Toya's case squarely fits within that principle. This is not a case where the defendant is merely one of several caregivers or where extended family can easily step in. Her children's father is neither financially capable nor emotionally willing to assume any meaningful role in their lives. Her 14-year-old, still in critical developmental years, faces total dislocation if her mother is incarcerated. Her 18-year-old son is just beginning college and is deeply emotionally dependent on Dr. Toya. The magnitude of the harm to these dependents, combined with the absence of meaningful alternatives and the unquestioned accuracy of the factual record, renders this case extraordinary under any standard. *See United States v. Husein*, 478 F.3d 318, 327 (6th Cir. 2007) (holding that a downward departure was warranted where no "reasonably available" alternative caregiver could provide support "relatively comparable" to that offered by the defendant).

As the probation department itself acknowledges, the circumstances here warrant serious consideration: "The probation department defers the determination

of how much of a departure, if any, is warranted under these guideline provisions to the Court. The probation department refers this matter to the Court for further resolution." ECF No. 77 at 35.

Put simply, a custodial sentence would not only destabilize a family; it would dismantle it. In light of these compelling and corroborated facts, Dr. Toya respectfully urges the Court to exercise its discretion and depart downward under § 5H1.6 in recognition of her irreplaceable role in the lives of her children and dependents.

## VI. Conclusion

For all the reasons set forth above, and those already submitted in her original Sentencing Memorandum, Dr. Toya respectfully asks this Court to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the purposes of 18 U.S.C. § 3553(a). Dr. Toya did not set out to defraud Medicare, nor did she knowingly participate in an orchestrated scheme. Her role was limited, her conduct clinically motivated, and her understanding of the regulatory environment shaped by cultural deference, professional isolation, and a good-faith reliance on facially legitimate actors. She did not profit substantially, held no administrative discretion, and did not occupy a role of trust relative to Medicare in the legal sense contemplated by the Guidelines.

The enhancements proposed in the PSR, particularly those for intended loss, sophisticated means, and abuse of trust, are disproportionate to her actual culpability and unsupported by the record. A mechanical application of the Guidelines in this case would produce a sentence far in excess of what is fair, just, or necessary to serve the goals of sentencing. Moreover, extraordinary family circumstances underscore the human cost of incarceration and the devastating impact a custodial sentence would have on her dependents, who rely on her for financial, emotional, and daily support.

Dr. Toya does not ask for leniency; only for recognition of her limited role, her sincere regret, her unwavering commitment to patient care, and the irreparable harm a custodial sentence would cause to her family. In light of all these circumstances, she respectfully urges this Court to grant a downward variance and impose a sentence that honors the principle of individualized justice embedded in § 3553(a).

Respectfully submitted,
CHAPMAN LAW GROUP

*/s/ Ronald W. Chapman II*
Ronald W. Chapman II, Esq., LL.M.
MI Bar No. P73179
1441 West Long Lake Road, Suite 310 Troy, Michigan 48098
T: (248) 644-6326
RWChapman@ChapmanLawGroup.com
*Attorney for Defendant Toya*

## CERTIFICATE OF SERVICE

I certify that the foregoing document was electronically filed on June 2, 2025.

Notice of this filing was sent by operation of the Court's electronic filing system to

all parties indicated on the electronic filing receipt.

/s/ *Ronald W. Chapman II*
Ronald W. Chapman II, Esq., LL.M.